

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-19-00009-CV

———————————————————

IN THE INTEREST OF B.W., A CHILD

---

On Appeal from the 235th District Court
Cooke County, Texas
Trial Court No. CV15-00769

---

Before Birdwell, Bassel, and Womack, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

### I. Introduction

This is a private termination proceeding in which the parental rights of Appellant C.W. (Father)[1] to his son Blake[2] were terminated on the petition of Appellee D.S. (Mother) following a bench trial. In two issues, Father argues that the trial court abused its discretion by not appointing an ad litem to represent Blake and challenges the sufficiency of the evidence to support the termination of his parental rights to Blake. Because the record does not demonstrate that the trial court abused its discretion by not appointing an ad litem for Blake and because sufficient evidence supports an unchallenged predicate ground of termination, we affirm.

### II. Background

During the termination trial, the trial court heard testimony from Mother, Paternal Grandmother, Paternal Grandfather, Paternal Great Aunt, and Paternal Uncle.

### A. Mother's Testimony

Mother and Father never married. Mother testified that she and Father were together about two years and stayed together about six months after Blake was born

---

[1]*See generally* Tex. Fam. Code Ann. § 109.002(d) (providing that on the court's own motion, it may in its opinion identify the parties by fictitious names or by their initials only).

[2]*See* Tex. R. App. P. 9.8(b)(2) (requiring court to use aliases to refer to minors in an appeal from a judgment terminating parental rights).

in 2013.[3]  At the time of the termination trial, Mother testified that Blake was five years old and was in kindergarten.

Mother testified that when she and Father had dated, he had assaulted her, but she did not file charges.  Mother testified that when she was pregnant with Blake, Father yelled at her, pushed her up against a wall, and then held her down in the front yard.  Mother said that Father had been violent towards her while Blake was present by verbally abusing her when Blake was only a few months old to a year old.

The record demonstrates that in 2015, Father was charged with aggravated assault with a deadly weapon and was placed on deferred-adjudication community supervision.  Mother testified that Father's criminal charge was a result of his assaulting his then-girlfriend.

Mother had concerns that Father was using drugs around the same time.[4] Mother testified that Father's drug usage created a situation that had endangered Blake's physical and emotional well-being.  Mother explained that Father had anger issues and was very violent when he was on drugs.  Mother said that Father had

---

[3]The record demonstrates that Father was ordered to pay monthly child support of $256 beginning January 1, 2014, and to provide health insurance for Blake.

[4]Mother was not sure how long Father had been on drugs and was not sure if he had used drugs during the time that they had lived together.

demonstrated violent tendencies toward his family,[5] his ex-girlfriend, and Mother. Mother testified that, to her knowledge, Father had not been violent towards Blake.

Mother testified that her concerns about Father's drug use were confirmed when his community supervision was revoked due to failed drug tests and he was adjudicated guilty of aggravated assault with a deadly weapon. A copy of the judgment adjudicating Father's guilt was admitted into evidence. The judgment reflects that Father was placed on deferred-adjudication community supervision in 2015; that the State filed a motion to adjudicate, alleging that Father had violated multiple conditions of his community supervision;[6] that he pleaded true to the alleged violations; and that the trial court found the allegations to be true, adjudicated Father

---

[5]Mother testified that she had seen Father hit Paternal Grandmother on the back with a broomstick and that he had been verbally abusive to Paternal Grandmother and Paternal Grandfather.

[6]The State alleged that Father had failed to report to the Cooke County Community Supervision and Corrections Department for four months; had failed to work his community service hours for twenty-four months; had failed to pay the urinalysis testing fee; had failed to abstain from consuming any illegal substance during his community supervision; had failed to attend the "SOP program" as directed by his community supervision officer; had failed to pay the probation fee for eighteen months; had failed to pay court costs; had failed to pay the $2,500 fine; had failed to attend and complete a Life Skills Class and provide proof of completion to his community supervision officer; had failed to attend and successfully complete an intensive anger management class as directed; and had failed to attend and successfully complete Batterer's Intervention programs approved by his community supervision officer.

guilty of aggravated assault, and sentenced him to ten years' confinement. The record reflects that Father's parole eligibility date is January 13, 2023.[7]

After Father tested positive for drugs, Mother filed her petition to terminate his parental rights in April 2018. In addition to Mother's concern that Father's drug usage might cause him to injure Blake, Mother testified that Father did not make any child support payments during 2017 and that he was not in prison and was able to make payments during that year.

Mother testified that before Father went to prison, his involvement with Blake was "[v]ery little." Mother said that Blake would visit often with Paternal Grandparents but that Father never picked up Blake or brought him back to Mother. Mother explained that there were occasions when it was Father's visitation time, but Paternal Grandparents would visit with Blake while Father went out partying with his friends.

Mother was not sure if Father loved Blake. Mother said that Father "had five years to see [Blake]. He could have c[o]me and seen him anytime he wanted, and he never did."

Mother testified that by the time of the termination trial, she had been married to T.S. for almost a year, that they had dated for several years prior to marriage, that he had been in Blake's life for four years, and that T.S. was the only real father figure

___

[7]The record demonstrates that if Father is not released on parole in 2023, he will not be released from prison until January 2028, at which point Blake will be fourteen and a half years old.

that Blake had known. Mother testified that T.S. planned to adopt Blake. Mother said that Blake had talked to her about changing his last name and wondered why his last name was different from hers. Mother requested that the trial court change Blake's last name to T.S.'s last name due to the poor reputation associated with Father's last name as a result of his criminal conviction.[8]

Mother opined that it was in Blake's best interest for the trial court to terminate Father's parental rights. Mother also requested that the trial court appoint her as sole managing conservator of Blake.

On cross-examination, Mother testified that she loved Paternal Grandparents and that they got along well with Blake. Mother said that Paternal Grandparents had offered her money to help her out and that she had "kindly told them that [she] didn't need it." Mother testified that Blake was on her insurance at work, so she did not use the Medicaid that Paternal Grandparents had renewed on Father's behalf for the benefit of Blake.

Mother testified that she had seen Father be verbally defiant towards Paternal Grandparents and refuse their instruction. As a result, Mother was concerned about Blake's going to visit Paternal Grandparents after Father gets out of prison. Mother had spoken to Paternal Grandparents about her concerns, but they would not agree to

---

[8]Ultimately, the trial court decided not to change Blake's last name and left that for any future adoption proceeding.

6

her request to not allow Father around Blake because they wanted Father to be allowed to be around Blake at family gatherings.

The trial court asked Mother why it would be in Blake's best interest for Father's parental rights to be terminated, and she said,

> [Father's] had violence, drug abuse, and anger issues. He hasn't been a father. He's had five years to be a father[,] and he hasn't. I don't want [Blake] seeing the way he lives. It would be in [Blake's] best interest, his safety and well-being, for my current husband to raise him and teach him the way of life. [Father], I don't see him doing that.

### B. Paternal Grandmother's Testimony

Paternal Grandmother testified that she and her husband have a very close relationship with Blake. Paternal Grandmother said that she called Mother whenever she wanted to see Blake and that Mother had been very cooperative in allowing Paternal Grandparents to see Blake. Paternal Grandmother admitted that Mother had been a great mother to Blake.

Paternal Grandmother testified that when Father was not using drugs, he was "amazing." Paternal Grandmother said that Father began using drugs at the end of high school and had used drugs off and on for eight years. Paternal Grandmother knew that Father had used K2, but she did not know that he had used methamphetamine and Xanax. Paternal Grandmother admitted that when Father was doing drugs, he would push her, yell at her, and scream at her and Paternal

7

Grandfather. Paternal Grandmother did not recall an incident in which Father had hit her with a broom.

Paternal Grandmother testified that Father truly loves Blake and wants to see Blake even though Blake is too young to visit Father in prison. Paternal Grandmother said that Father had not been "influential the whole time" and that he had regretted not spending as much time with Blake as he could have. Paternal Grandmother testified that when Father had spent time with Blake, they had ridden four-wheelers, had gone fishing, and had hung out and enjoyed their time together. Paternal Grandmother testified that Father and Blake "truly have a bond" and that Blake asks about Father "all the time."

Paternal Grandmother testified that it would not be in Blake's best interest for the trial court to terminate Father's parental rights because

> [Father] loves [Blake] very much. He went through some real bad times, and we don't condone anything that he did. He made some bad choices. But I don't feel that terminating [Blake's] relationship [with Father] should be done because of that. He is in the penitentiary. He is -- once he gets to his permanent place, he is taking classes to work with his problem -- problems that he has.
>
> He -- he's never hurt [Blake], never hit [Blake], never in any way showed any kind of hostility towards [Blake]. His -- when he had hostility with other people, I do blame it on the drugs he was doing. But he's going to be in there five years. He is going to be drug free when he comes out. He's going to church every Sunday. I just don't believe that terminating [Blake's] relationship with his father would do any justice for either one of them.

Paternal Grandmother said that it would be in Blake's best interest to have contact with his family.

On cross-examination, Paternal Grandmother admitted that someone who had abused drugs and had committed aggravated assault with a deadly weapon was not a good, stable parent. Paternal Grandmother could not guarantee that Father would stay clean after he is released from prison. Paternal Grandmother agreed that it concerned her that Father could not stay clean and follow the court's orders back when he was on community supervision and was facing up to twenty years in prison.

### C. Paternal Grandfather's Testimony

Paternal Grandfather admitted that he and Father had engaged in verbal altercations but not physical altercations. Paternal Grandfather did not condone Father's "prior problems."

Paternal Grandfather opined that Father loves Blake. Paternal Grandfather testified that before Father went to prison, he visited with Blake when they brought him to their house as long as it was not during Father's work hours. Paternal Grandfather said that Blake cried every time they took him home because he did not want to go home. Paternal Grandfather testified that taking Blake away from his family was not in Blake's best interest.

On cross-examination, Paternal Grandfather testified that he was unaware of Father's drug use when Father was living in a small apartment behind Paternal Grandparents' home while he was on community supervision. Paternal Grandfather

9

agreed that Father had been given numerous opportunities to get clean and to be a good father to Blake and that in spite of those opportunities, Father had not taken advantage of them and would be in prison until at least 2023. Paternal Grandfather admitted that Mother is a great mother to Blake and wants what is in his best interest.

### D.  Paternal Great Aunt

Paternal Great Aunt testified that Blake is very attached to Paternal Grandfather, Paternal Grandmother, Father, and the rest of the family and gets "a great deal of love and support from the family." Paternal Great Aunt opined that it "would be wrong . . . to take that [love and support] away from any child." Paternal Great Aunt testified that she had seen Father with Blake six times in five years, that Father had acted lovingly towards Blake, and that Blake had seemed to be very attached to Father.

### E.  Paternal Uncle

Paternal Uncle testified that Blake loves Father. Paternal Uncle testified that Father's parental rights should not be terminated because he is a loving father and is not a threat to his son "whatsoever." Paternal Uncle testified that Father had never physically hit him and that Father did not have a violent temper. Paternal Uncle knew that Father had used methamphetamine before he went to prison but testified that Father had never shown any kind of aggression towards Blake. Paternal Uncle did not believe that it was a trait of a good father to use drugs in violation of a court order prohibiting him from using drugs.

## F.  Trial Court's Disposition

After hearing the testimony and reviewing the evidence, the trial court found by clear and convincing evidence that Father had

> engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child.

> By his own admission, in Petitioner's Exhibit No. 1, he was physically abusive to a girlfriend, he committed the offense of aggravated assault with a deadly weapon, he used while on -- he was given an opportunity on probation, and he didn't take advantage of that opportunity.  He admitted to using Xanax, methamphetamine, amphetamine[,] and THC.

> He was given an opportunity to help him with his anger issues. He failed to attend the life skills class[ and] the intensive anger management class, [and] he failed to complete the batterer's intervention program.

> So I find by clear and convincing evidence that he's engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child.

> I also find by clear and convincing evidence that he -- by virtue of [Petitioner's] Exhibit No. 3, which shows no child support payment at all in 2017, while he was not incarcerated and was supposed to be working, according to the terms of his probation, that he failed to support the child in accordance with his ability during the period of one year, ending within six months of the date of filing of this petition.

> The [c]ourt finds by clear and convincing evidence that he used a controlled substance, as defined by Chapter 481 of the Health and Safety Code, in a manner that endangered the health or safety of the child.

> And finally, the [c]ourt finds by clear and convincing evidence that he knowingly engaged in criminal conduct that has resulted in his conviction of an offense, and his confinement or imprisonment and

11

inability to care for the child for not less than two years from the date of filing the petition.

By the time [Father] gets out of the penitentiary, that is -- the child's 5 now. That's almost his entire lifetime again. He'll be out in four and a half years.

The [c]ourt finds by clear and convincing evidence that it is in the best interest of [Blake] to terminate the parent[–]child relationship between [Father] and the child.

The trial court's oral rendition was memorialized in a written order terminating Father's parental rights to Blake.

### III.  No Abuse of Discretion Shown in Not Appointing an Ad Litem

In his first issue, Father argues that the trial court abused its discretion by not appointing an ad litem under section 107.021.

### A.  Applicable Law and Standard of Review

Texas Family Code section 107.021 provides for the discretionary appointment of counsel in private termination suits as follows:

(a) In a suit in which the best interests of a child are at issue, other than a suit filed by a governmental entity requesting termination of the parent[–]child relationship or appointment of the entity as conservator of the child, the court may appoint one of the following:

(1) an amicus attorney;

(2) an attorney ad litem; or

(3) a guardian ad litem.

(a-1) In a suit requesting termination of the parent[–]child relationship that is not filed by a governmental entity, the court shall, unless the court finds that the interests of the child will be represented adequately by a

12

party to the suit whose interests are not in conflict with the child's interests, appoint one of the following:

(1) an amicus attorney; or

(2) an attorney ad litem.

(b) In determining whether to make an appointment under this section, the court:

(1) shall:

(A) give due consideration to the ability of the parties to pay reasonable fees to the appointee; and

(B) balance the child's interests against the cost to the parties that would result from an appointment by taking into consideration the cost of available alternatives for resolving issues without making an appointment;

(2) may make an appointment only if the court finds that the appointment is necessary to ensure the determination of the best interests of the child, unless the appointment is otherwise required by this code; and

(3) may not require a person appointed under this section to serve without reasonable compensation for the services rendered by the person.

Tex. Fam. Code Ann. § 107.021. We review a finding made under this section for an abuse of discretion. *See In re C.A.P.*, No. 04-12-00553-CV, 2013 WL 749825, at *2 (Tex. App.—San Antonio Feb. 27, 2013, pet. denied) (mem. op.).

## B. Findings of Facts and Conclusions of Law

Here, the trial court made the following relevant findings of fact and conclusions of law:

13

3. On September 29, 2016, this Court entered an Order in Suit to Modify Parent[–]Child Relationship in this cause removing [Mother] and [Father] as joint managing conservators and naming [Mother] as Sole Managing Conservator of the child [Blake].

4. In the Order in Suit to Modify Parent[–]Child Relationship rendered by this Court on September 29, 2016, the Court found that [Father] has a history or pattern of committing family violence during the two-year period preceding or during the pendency of the suit.

5. Also in the Order in Suit to Modify Parent[–]Child Relationship in this cause entered on September 29, 2016, [Father] was ordered to make payments to [Mother] for current child support in the amount of $256.00 per month and retroactive child support in the amount of $57.00 per month for the support of the child the subject of this suit.

6. [Mother] filed an Original Petition to Terminate Parent[–]Child Relationship on April 5, 2018, requesting the Court to waive the appointment of an Attorney Ad Litem for the child and to terminate the parent[–]child relationship between [Father] and [Blake].

. . . .

8. [Mother], the mother and sole managing conservator of the child[,] has been the primary caregiver and decision maker for the child for the entirety of the child's young life.

9. [Mother] is a great mother to the child as witnesses called on behalf of [Father] stated in their testimony.

. . . .

*Conclusions of Law*

. . . .

18. The mother's interests do not conflict with the interests of the child[;] therefore[,] the interests of the child are adequately represented by the mother[,] and thus the appointment of an attorney ad litem was not necessary in this case to determine the best interests of the child.

14

## C. Analysis

Father argues that the trial court ignored the statute's first requirement—to give due consideration to the ability of the parties to pay reasonable fees to the appointee—because the trial court accepted as evidence only Father's incarceration. A plain reading of the statute, however, demonstrates that the trial court is not permitted to appoint an attorney ad litem in a private termination unless the trial court finds that the appointment is necessary to ensure the determination of the child's best interests. *See* Tex. Fam. Code Ann. § 107.021(b); *see also Vargas v. Vargas*, No. 01-15-00690-CV, 2016 WL 3227964, at *3 (Tex. App.—Houston [1st Dist.] June 9, 2016, no pet.) (mem. op.). Here, the trial court specifically found that an appointment was unnecessary. Therefore, whether the parties could pay an ad litem's fees never became relevant. *See Vargas*, 2016 WL 3227964, at *3.

The record reflects that the primary interest of Mother—who had previously been the victim of a physical assault and verbal assaults by Father and who had witnessed him verbally assault Paternal Grandparents—was to protect Blake from Father. Mother testified that she was concerned that Father might injure Blake because Father had anger issues and was very violent when he was on drugs. And the trial court had previously found that Father had a history or pattern of committing family violence. Because this constitutes some evidence to support the trial court's conclusion that Mother adequately represented Blake's interests, we hold that the trial court did not abuse its discretion by not appointing an attorney ad litem for Blake. *See*

15

*C.A.P.*, 2013 WL 749825, at *2 (holding that trial court did not abuse its discretion by not appointing an attorney ad litem for child because mother's testimony supported trial court's finding that child's interests were adequately represented by mother); *In re R.J.C.*, No. 04-09-00106-CV, 2010 WL 816188, at *3 (Tex. App.—San Antonio Mar. 10, 2010, no pet.) (holding that trial court did not abuse its discretion by failing to appoint an attorney ad litem for child because trial court found that mother had no interest adverse to child and adequately represented child's interests and because record demonstrated that mother was trying to protect child from father); *see also In re A.C.W.*, No. 12-11-00137-CV, 2012 WL 1379653, at *2 (Tex. App.—Tyler Apr. 18, 2012, no pet.) (mem. op.) (holding that trial court did not abuse its discretion by not appointing an attorney ad litem for child because trial court followed the statute in making its findings); *In re T.L.W.*, No. 12-10-00401-CV, 2012 WL 1142475, at *3 (Tex. App.—Tyler Mar. 30, 2012, no pet.) (mem. op.) (holding that trial court did not abuse its discretion by failing to appoint an attorney ad litem for child).

Father relies on *In re D.M.O.* for the proposition that "where parents are adversaries in a suit to terminate one parent's rights, the trial court can seldom find that one party adequately represents the interests of the children involved or that their interests are not adverse." No. 04-17-00290-CV, 2018 WL 1402030, at *3 (Tex. App.—San Antonio Mar. 21, 2018, no pet.) (mem. op.). Father, however, recognizes that *D.M.O.* and many of the other cases he cites involve situations in which the trial court did not make any determinations or findings under section 107.021, but he

16

argues that this case is fundamentally no different because the trial court did not follow the guiding rules and principles of the statute and "performed a five-question, perfunctory inquiry rooted in expediency for the trial court." We disagree.

First, *D.M.O.* is distinguishable from the facts before us; the father in *D.M.O.* testified at trial that he wished to maintain a relationship with his child and brought evidence to support his arguments, and there was no evidence that the father in *D.M.O.* had engaged in violent or physically abusive behavior, had been incarcerated, or had otherwise engaged in conduct endangering the child. *Id.* at *4. Second, the statute does not set forth a set of questions that must be asked or a checklist of tasks that must be performed before the trial court can find that the appointment of an ad litem is not necessary to ensure the determination of the best interests of the child. *See generally* Tex. Fam. Code Ann. § 107.021(b). Moreover, as set forth above, the trial court followed the statute in making its finding, and its finding is supported by the record.

Father further argues that the trial court "seemed more than anything frustrated that a request for an ad litem came the day of trial" and that the trial court's "clear bias to appointing an ad litem cleared the way for it to avoid its statutory obligations." Father has not demonstrated that the trial court was biased because judicial rulings alone do not constitute a basis for bias. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 240–41 (Tex. 2001). Moreover, as set forth above, the trial court did not avoid its statutory obligation but fulfilled it by finding, as allowed by the statute, that the

appointment of an attorney ad litem was not necessary in this case to determine the best interests of the child. *See* Tex. Fam. Code Ann. § 107.021(b)(2).

Accordingly, we overrule Father's first issue.

## IV. Sufficient Evidence Supports Unchallenged Termination Findings

In his second issue, Father challenges whether there is clear and convincing evidence to support the termination of his parental rights. [Ant's Br. @ 8, 20] In particular, Father argues that there is insufficient evidence that he engaged in conduct that endangered Blake's well-being or that his drug use endangered Blake. *See id.* § 161.001(b)(1)(E), (P).

### A. Burden of Proof and Sufficiency Standards of Review

For a trial court to terminate a parent–child relationship, the party seeking termination must prove two elements by clear and convincing evidence: 1) that the parent's actions satisfy one ground listed in family code section 161.001(b)(1); and 2) that termination is in the child's best interest. *Id.*. § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802.

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction

18

that the finding is true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant them or the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the parent violated at least one subsection of 161.001(b)(1) and that the termination of the parent–child relationship would be in the child's best interest. Tex. Fam. Code Ann. § 161.001(b)(1), (2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

19

## B. Unchallenged Section 161.001(b)(1) Findings

Father acknowledges in his brief that his parental rights were terminated based on four grounds: endangering conduct (subsection (E)); failure to support Blake (subsection (F)); use of a controlled substance in a manner that endangered Blake (subsection (P)); and criminal conduct that resulted in a conviction and confinement (subsection (Q)). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E), (F), (P), (Q). But Father's arguments on appeal challenge only the endangering-conduct ground and the controlled-substance ground. By failing to challenge the trial court's findings under subsections (F) and (Q), Father has waived any complaint about the sufficiency of the evidence to support these findings. *See id.* (requiring only one predicate ground to support termination); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) (interpreting section 161.001(b) as requiring only one predicate ground); *see also Toliver v. Tex. Dep't of Family & Protective Servs.*, 217 S.W.3d 85, 102–03 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (holding failure to challenge all of trial court's predicate-ground findings resulted in waiver).

Nevertheless, the record before us contains sufficient evidence to support the trial court's unchallenged subsection (F) and (Q) findings.[9] As demonstrated by the

---

[9]Texas Family Code section 161.001(b)(1) provides that the trial court may terminate the parent–child relationship if the trial court finds by clear and convincing evidence that the parent has

"Texas Child Support Disbursement Unit Payment Record" from the Office of the Attorney General, Father did not make a single child support payment from January through December 2017, which was within six months of April 2018—the date when Mother filed her petition to terminate Father's parental rights to Blake, and by Mother's testimony that Father was not in prison and was able to pay child support during 2017. *See In re K.A.H.*, 195 S.W.3d 840, 843 (Tex. App.—Dallas 2006, no pet.) (holding evidence sufficient to support finding that father did not support his child for a period of one year). Moreover, Father does not dispute that he knowingly engaged in criminal conduct that has resulted in (1) his conviction and (2) his imprisonment and inability to care for Blake for not less than two years from the date Mother filed her petition to terminate Father's parental rights. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(Q).

---

(F) failed to support the child in accordance with the parent's ability during a period of one year ending within six months of the date of the filing of the petition[ or]

. . . .

(Q) knowingly engaged in criminal conduct that has resulted in the parent's:

(i) conviction of an offense; and

(ii) confinement or imprisonment and inability to care for the child for not less than two years from the date of filing the petition[.]

Tex. Fam. Code Ann. § 161.001(b)(1)(F), (Q).

21

Because only one ground under section (b)(1) is necessary to support termination, we overrule Father's second issue. *See In re G.H.*, No. 02-18-00080-CV, 2018 WL 3968788, at *10 (Tex. App.—Fort Worth Aug. 16, 2018, no pet.) (mem. op.) (overruling issues challenging other section 161.001(b)(1) grounds for termination because the record contained sufficient evidence to support an unchallenged section 161.001(b)(1) ground).[10]

## V. Conclusion

Having overruled Father's two issues, we affirm the trial court's order terminating his parental rights to Blake.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: May 9, 2019

---

[10]Father also includes within his second issue a one-sentence argument challenging the trial court's best-interest finding: "Father further disputes that termination is in the Child's best interest." Father does not, however, cite the seminal case of *Holley v. Adams*, does not list the *Holley* factors, and does not provide any analysis to support his one-sentence argument. 544 S.W.2d 367, 371–72 (Tex. 1976). Accordingly, the argument is insufficiently briefed. *See* Tex. R. App. P. 38.1(i). As such, Father has waived any challenge to the trial court's best-interest finding. *See In re D.N.M.*, No. 07-18-00251-CV, 2018 WL 4374705, at *3 n.4 (Tex. App.—Amarillo Sept. 13, 2018, no pet.) (mem. op.) (concluding that appellant's inadequate briefing waived any challenge to best-interest finding); *In re D.V.*, No. 06-16-00065-CV, 2017 WL 1018606, at *7 (Tex. App.—Texarkana Mar. 16, 2017, pets. denied) (mem. op.) (same); *In re C.L.*, No. 04-03-00638-CV, 2004 WL 86136, at *3 (Tex. App.—San Antonio Jan. 21, 2004, no pet.) (mem. op.) (holding that appellant waived error by providing nothing more than a four-sentence "argument" summarily claiming there was no evidence that termination was in children's best interest).

22